UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JASON CRAPE, *et al.*,

                Plaintiffs,                            Case No. 1:13-cv-1063

v.                                            HON. JANET T. NEFF

CITY OF BATTLE CREEK, *et al.*,

                Defendants.

_____/

## OPINION

Now pending before the Court in this race discrimination case is Defendants' Motion for Summary Judgment (Dkt 61). Plaintiffs filed a response to Defendants' motion (Dkt 63), and Defendants filed a reply (Dkt 64). Having conducted a Pre-Motion Conference in this matter and having fully considered the parties' written briefs, stipulated statements of fact and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court concludes that Defendants' motion is properly granted.

## I. BACKGROUND

The City of Battle Creek ("the City") is a municipal governmental entity that employs firefighters to work in Battle Creek, Michigan (JSF[1] ¶ 1). The Civil Service Commission ("the Commission") is established pursuant to the Police and Fire Civil Service Act ("Act 78"), MICH. COMP. LAWS § 38.501 *et seq.* (*id.* ¶ 2). The Commission is made up of three individuals (*id.* ¶ 3).

---

[1]The parties stipulated and agreed to a joint statement of uncontested material facts related to Defendants' Motion for Summary Judgment (Dkt 59, J. Statement of Facts [JSF]).

One member of the Commission is selected by the City, another by the Fire Fighters Union, and the third Commissioner is an outsider selected by the first two Commissioners to be the "neutral" Commissioner (*id.*). Commissioners are volunteers and are not paid for their public service (*id.* ¶ 4).

In April 2001, the Commission promulgated rules for the hiring and promotion of firefighters (JSF ¶ 5). To apply for a position or a promotion with the Battle Creek Fire Department, applicants are required to go through the Act 78 process conducted by the Commission (*id.* ¶ 6). First, an applicant must put his or her name on a sign-up list (*id.* ¶ 7). Second, each applicant must take a written test (*id.* ¶ 8). The written test accounted for 50 percent of the applicant's total score (*id.*). Third, each applicant must participate in an oral examination (*id.* ¶ 9). The oral examination accounts for the remaining 50 percent of the applicant's total score (*id.*). The oral examination score is made up of 75 percent group interview scores (*id.* ¶ 10). All of the applicants participate together in the group interviews, referred to as the Multiple Interview Assessment, or "MIA" (*id.*). The remaining 25 percent of the oral examination score is based on a review of the applicant's civil service file (*id.* ¶ 11). The civil service file includes an applicant's training, education, commendations, and yearly evaluations (*id.*). Each applicant meets individually with the Commissioners to review his or her civil service file, answer related questions and give any additional input the applicant wishes to provide (*id.*). For the file review portion of the application process, each Commissioner gives an individual score ranging from 0 to 5 (*id.* ¶ 13). The three Commissioners reach a "consensus" score, which is multiplied by 5 and added to the MIA score (*id.*). That number is then divided by two to create the Oral Score (*id.*).

Last, after the scoring on the written test and oral examination is completed, seniority points are added to determine the final score (JSF ¶ 14).  Each applicant receives a one-half point (.5) of seniority credit for each full year of service with the fire department (*id.*).  Under Act 78, an applicant must obtain a minimum final score of 70 percent (including seniority) to be considered eligible for a promotion (*id.* ¶ 16).  Once the final total scores are determined, the Commission is required to certify and publish a list of the applicants who obtained a score of 70 percent or more, in the order of their scores, with the highest scoring individual listed first (JSF ¶ 17).  The eligibility list remains effective for two years from the date of publication (*id.* ¶ 18).  When a vacancy occurs, the person with the highest score on the list who has not yet been offered the position must be offered the promotion (*id.*).  Under the applicable Civil Service Rules, the City must offer the promotion to the highest scoring applicant on the eligibility list and, thereafter, offer the open position to the next highest scoring applicant and proceed down the list in that manner until the list expires (*id.* ¶ 19).

During 2010, the Commission retained a third-party vendor, Police Consultants Incorporated ("PCI"), to provide and administer the written test, provide the MIA interview questions and instructions, train the Commissioners on how to conduct the MIA, and score the applicants on the written test and the MIA portion of the oral score (JSF ¶ 12).  PCI scored the oral portion based on score sheets filled out by the individual members of the Commission (*id.*).

The City hired Jason Crape as a firefighter on November 25, 2002 (JSF ¶ 21).  At that time, Larry Hausman was Chief of the Battle Creek Fire Department (*id.* ¶ 23).  In August 2010, a Fire Training Officer ("Training Officer") position became available in the Fire Department (*id.* ¶ 24).  The Training Officer conducts training for firefighters on many different topics, including ropes and

knots, confined space, hazardous materials, and medical training (*id.* ¶ 25).  The following five individuals applied for the 2010 Training Officer promotion and went through the Act 78 application process with the Commission:  Calvin Hardin (African-American); (2) Shawn Metheny (Caucasian); (3) Mihaly Drabik (African-American); (4) Mark Koch (Caucasian); and (5) Jason Crape (African-American) (*id.* ¶¶ 22, 26-27).  While Drabik is listed as African-American in certain places, he is identified on the MIA score sheets as "Multi" (*id.*).  The Commission's Rules were in effect and governed the 2010 Fire Training Officer selection process, and Crape and all the applicants knew the scoring formula (*id.* ¶¶ 5, 15).

In 2010, the Commission members were Gordon Vogt, Kenneth Bell and Jennifer Cappell (JSF ¶ 28).  All three are Caucasian (*id.*).  Vogt was a retiree of the Fire Department and was voted by the Union as its Commission representative (*id.* ¶ 29).  Bell is the former Risk Manager for the City of Battle Creek and was selected by the City as its Commission representative (*id.* ¶ 30).  Cappell is a Project Manager for Kellogg Company and was the outside civilian selected to be the neutral Commissioner (*id.* ¶ 31).

PCI developed, administered and scored the 2010 Training Officer written examination (JSF ¶ 32).  Each applicant was provided with the same study materials to prepare for the written test (*id.* ¶ 33).  All of the questions on the written test were based on the study materials (*id.* ¶ 34).  Each applicant took the same written examination (*id.* ¶ 35).  PCI administered the written test to all five applicants for the Training Officer promotion on September 20, 2010 (*id.* ¶ 36).  PCI graded and scored the test answers (*id.* ¶ 37).  Neither the Commission nor the City had any role in the development, administration, or scoring of the 2010 Training Officer written test (*id.* ¶ 38).  Crape

and Drabik, the minority applicants, scored highest on the written examination (Dkt 60-43, J. Ex. 43, Final Results).

The oral examination—the MIA and the individual file review—occurred on October 15, 2010, several weeks after the written testing was completed (JSF ¶¶ 39, 43).  Neither the City nor the Commission developed the oral MIA interview questions or calculated the final score (*id.*). Rather, PCI developed the questions for the group interview or MIA portion of the oral examination and provided the questions to the Commission (*id.* ¶ 40).  PCI trained the Commission members on the MIA procedures (*id.* ¶ 41).  The Commissioners selected interview questions from the list PCI drafted and provided them (*id.*).  Each applicant was given a different colored piece of paper and identified in scoring only by that color, not by name (*id.* at ¶¶ 41-42).  Applicant names were not disclosed until after the MIA interview, although Vogt knew all of the applicants (*id.* at ¶ 42).

Each applicant was asked the same questions during the MIA interview (JSF ¶ 43).  Each Commissioner rated the applicants during the MIA based upon the following criteria:  appearance, social appropriateness, verbal fluency, ability to listen and understand, judgment and intelligence, creativity and originality, social interaction and  leadership (*id.* ¶ 45).  The Commissioners rated applicants during the MIA on a scale of 1 to 5 (in ½ point intervals) (*id.* ¶ 46).  PCI trained the Commission members to rate the applicants during the MIA by giving each applicant an initial rating of "3," as the intermediate value, and adjusting the score up or down depending on how the individual answered the question and participated in the interview (*id.* ¶ 47).  The Commissioners did not calculate the applicants' final scores for the MIA (*id.* ¶ 48).  The rating sheets from all three Commissioners were sent to PCI, where the final oral examination scores were calculated (*id.*).

Following completion of the MIA portion of the oral examination, each applicant met individually with the Commissioners to review his civil service file (JSF ¶ 49). Each applicant had the opportunity to highlight any positive or explain any negative notations in his civil service file, answer questions relative to the file, and add any additional input he wished to provide (*id.* ¶ 50). The Commissioners individually rated each applicant based on this file review (*id.* ¶ 51). After the Commission members individually rated all of the applicants based upon the file review, the Commissioners discussed their ratings and agreed upon a consensus score for each applicant (*id.* ¶ 52). Each applicant's score for the MIA and written testing was calculated by PCI (*id.* ¶ 53). After PCI provided the final scores for the written testing and the oral examinations, the City Clerk then added the seniority points to determine the applicant's final score (*id.* ¶ 54).

Crape had worked for the Battle Creek Fire Department for seven years at the time he applied for the 2010 Training Officer promotion; therefore, he was entitled to and was credited with 3.5 seniority points (JSF ¶ 55). Koch began work with the Fire Department in 2001 and had worked for the Fire Department for nine years at the time he applied for the 2010 Training Officer position; therefore, Koch was entitled to and was credited with 4.5 seniority points (*id.* ¶ 56). Metheny was hired into the Fire Department in 1993, and had worked for the Fire Department for more than 15 years when he applied for the 2010 Training Officer position; therefore, he was entitled to and was credited with 8.5 seniority points (*id.* ¶ 57). Drabik was entitled to and credited with 3.5 seniority points during the 2010 Training Officer application process (*id.* ¶ 58). Hardin was awarded 7.5 seniority points during the 2010 Training Officer application process (*id.* ¶ 59).

On the final eligibility list certified by the Commission, the eligible applicants were scored as follows:

      1.       Mark Koch, 80.07;

      2.       Shawn Metheny, 77.36;

      3.       Mihaly Drabik, 75.46; and

      4.       Jason Crape, 75.41

(JSF ¶ 61).  Hardin was not eligible for the 2010 Training Officer promotion based on his final score, which was less than the 70 point requirement (*id.* ¶ 60).  Koch, the highest scoring applicant, was offered the promotion, and Koch accepted the position (*id.* ¶ 62).

In August 2012, however, Koch resigned from the position, and the position was therefore offered to Metheny, the next applicant on the eligibility list (JSF ¶¶ 63-64).  Metheny declined the position (*id.* ¶ 64).  The Training Officer position was next offered to Drabik, who accepted the position (*id.* ¶ 65).  The 2010 Training Officer eligibility list expired on October 15, 2012 (*id.* ¶ 66). On January 13, 2013,[2] Drabik resigned from the Battle Creek Fire Department (*id.*).  If Drabik had resigned before October 15, 2012, then Crape, as the next eligible person on the eligibility list, would have been offered the Training Officer promotion (*id.*).

On September 27, 2013, Plaintiff and Thomas Richardson, the trustee in Plaintiff's bankruptcy case, initiated this case, alleging the following claims:

      I.      Race Discrimination—Title VII—Disparate Treatment

      II.     Claim for Prospective Injunctive Relief under Title VII

      III.    Race Discrimination—Elliot–Larsen Civil Rights Act—Disparate Treatment

      IV.    Race Discrimination—Title VII—Disparate Impact

--------

[2] The parties' joint statement of uncontested material facts includes a typographical error, indicating that Drabik resigned on "January 13, 203" (Dkt 56, JSF ¶ 66).  The context of the statement supports that the resignation occurred in 2013.

V.      Race Discrimination—Elliot–Larsen Civil Rights Act—Disparate Impact

VI.     Retaliation—Elliot–Larsen Civil Rights Act

VII.    Equal Protection 42 U.S.C. § 1983

(Dkt 1).  Defendants filed an Answer (Dkt 9), and, pursuant to the Case Management Order (Dkt 13), the parties subsequently engaged in discovery as well as an unsuccessful mediation session in July 2014.  At a Pre-Motion Conference in October 2014, Plaintiffs withdrew portions of their Complaint. Specifically, as memorialized in this Court's Order (Dkt 53), Plaintiffs withdrew Count II, which sought injunctive relief as an independent claim; Counts III and IV as to the 2013 promotion decision in this case; and the retaliation claim in Count VI.  The Court permitted the parties to proceed with briefing Defendants' proposed motion for summary judgment on the remaining claims (*id.*).  The parties filed their motion papers in January 2015 (Dkts 59-64).

## II.  ANALYSIS

### A.  Motion Standard

A motion for summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

8

**B. Discussion**

**1.     Disparate Treatment (Counts I & III)**

In Counts I and III,[3] Plaintiffs present claims of disparate treatment race discrimination under federal and state law.  Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."   42 U.S.C. § 2000e-2(a)(1).   Similarly, Michigan's ELCRA prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race. . . . "   MICH. COMP. LAWS § 37.2202(1)(a).  "Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases."  *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 652-53 (6th Cir. 2012) (quoting *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007)); *see also Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003).

"'The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.'"  *Geiger v. Tower Automotive,* 579 F.3d 614, 620 (6th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).  A race discrimination claim may be proved through either direct or circumstantial evidence.  *Brewer v. New Era, Inc.*, 564 F. App'x 834, 841 (6th Cir. 2014); *Heike v. Guevara*, 519 F. App'x 911, 919 (6th Cir. 2013).  The parties agree that Plaintiffs are relying on circumstantial evidence (Defs.' Br., Dkt 62 at 17; Pls.' Resp., Dkt 63 at 14-15).

---

[3]In their motion brief, Defendants incorrectly reference Plaintiffs' disparate treatment race discrimination claims as Counts I and II (Defs.' Br., Dkt 62 at 16).

9

In order to survive summary judgment on a claim of race discrimination using circumstantial evidence, a plaintiff must produce evidence sufficient to meet his prima facie burden under the test initially developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (clarifying the *McDonnell Douglas* burden-shifting framework). In a failure-to-promote employment discrimination case, the Sixth Circuit has modified the elements of the test to fit the specific context. *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000); *see also Culver v. CCL Label, Inc.*, 455 F. App'x 625, 629 (6th Cir. 2012) (drawing a distinction between the prima facie burden required of a plaintiff alleging discrimination in the failure-to-promote context versus the discharge context). The parties agree that under *Nguyen*, the governing precedent, a plaintiff with a discrimination claim based on a failure to promote must demonstrate that (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time the plaintiff's request for the promotion was denied (Defs.' Br., Dkt 62 at 17; Pls.' Resp., Dkt 63 at 15). *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005) (citing *Nguyen, supra* at 562-63)). An important function of the prima facie test is to eliminate the most common nondiscriminatory reasons for the employer's action. *Burdine*, 450 U.S. at 253–54.

Once a plaintiff satisfies his prima facie burden, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Arnold v. City of Columbus*, 515 F. App'x 524, 530 (6th Cir. 2013); *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 584 (6th Cir. 2009). After the defendant raises a legitimate nondiscriminatory reason, "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255. Specifically, the

plaintiff must prove by a preponderance of the evidence that the reasons offered by the employer were pretextual.  *Upshaw*, 576 F.3d at 584.  Throughout this burden-shifting process, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.* (quoting *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004)).

  a. *Prima Facie Case*

   Defendants do not dispute either that Crape is a member of a protected class or that he was objectively qualified for the promotion, the first and second elements of a prima facie case.  Rather, Defendants focus on the fourth element, arguing that Plaintiffs cannot prove that Crape was passed over for a non-African-American employee who had similar qualifications (Defs.' Br., Dkt 62 at 19).[4]  According to Defendants, the individuals listed higher on the Commission's eligibility list "scored higher during the application process and had more seniority and, therefore, were more qualified than Crape" (*id.*).  Defendants posit that the other three applicants, including African American Drabik, were individually and in total "more qualified" than Crape, and thus "not similar in all relevant aspects" (*id.*).  Defendants opine that Plaintiffs' only support for their contention that

---

  [4]Defendants' argument focuses primarily on the fourth element of a prima facie case, but Defendants also tangentially challenge the third element, asserting that it is "worth noting" that Crape was not "denied the promotion" where Crape was listed as one of four firefighters eligible for a promotion (Defs.' Br., Dkt 62 at 21 n.12).  To the extent Defendants sufficiently advance this argument, the Court determines that the employment action taken in this case, placing Crape last on the promotion eligibility list, effectively postponed Crape's promotion and therefore constitutes an adverse employment action against him.  *See Nguyen*, 229 F.3d at 562-63 ("A failure to promote is an adverse employment action."); *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 523 (Mich. 2001) (same).  *See also Freeman v. Potter*, 200 F. App'x 439, 442 (6th Cir. 2006) (indicating that "diminished options for advancement" may constitute a material adverse action).

Crape was similarly situated to the other applicants is Crape's own subjective belief that he was more qualified, which is nothing more than conjecture and speculation (*id.* at 20-21).[5]

In response, Plaintiffs argue that Defendants overstate the level of comparison required under the fourth prong at the prima facie stage (Pls.' Resp., Dkt 63 at 16). According to Plaintiffs, the review "should not be overly exacting" and does not require a plaintiff to demonstrate that his employment situation is "nearly identical" to that of the individual who received the promotion (*id.*). Plaintiffs argue that Defendants also improperly attempt to "import" their nondiscriminatory reason into the prima facie stage (*id.* at 17).

In reply, Defendants clarify that they are not arguing that "employees must be exactly the same in every aspect of employment," only that the Court must inquire into the "relevant aspects" of the individuals' employment (Reply, Dkt 64 at 4 n.1).

The Court determines that Plaintiffs' evidence does not state a prima facie case.

"In a failure to promote claim, the emphasis in the fourth element is on the relative qualifications of the plaintiff and the employee who actually received the promotion." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011) (citing *White*, 429 F.3d at 240-41). The prima facie burden is "not intended to be onerous," and a plaintiff is not required to establish that he and the employee receiving the promotion "had the exact same qualifications." *Id.* "Requiring

---

[5]Defendants also argue that Plaintiffs cannot make out a prima facie case of unlawful race discrimination against the City, in particular, because the City took no adverse employment action against Crape inasmuch as the City had "no role" in the promotion process or decision (Defs.' Br., Dkt 62 at 18-19). It is unnecessary for the Court to resolve this issue inasmuch as Plaintiffs have failed to demonstrate a prima facie case or pretext against either the City or the Commission. Defendants acknowledge that the arguments they proffer on behalf of the Commission equally apply to the City (*id.* at 21 n.13).

a plaintiff to show identical qualifications to another individual is not realistic from a human standpoint." *Id.*

Instead, the Sixth Circuit has indicated that "what is required in a failure to promote case is for the plaintiff to show she possesses 'similar qualifications' to the employee who received the promotion." *Provenzano, supra.* The Sixth Circuit has alternatively phrased the inquiry required of the fourth element as an "independent review" of the "relative qualifications" of the plaintiff and the person selected for the position based on the evidence presented. *White*, 429 F.3d at 243. Similarly, the Sixth Circuit has stated that a trial court is to conduct a "general weighing" of the "comparative qualifications." *Wilson v. Ford Motor Co.*, 513 F. App'x 585, 589 (6th Cir. 2013).

In short, a trial court must make "'some comparison of qualifications ... but not the sort of close comparison that might include consideration of the employer's evaluation of subjective traits or other details about why the non-protected person was in fact selected over the plaintiff.'" *Weeks v. Michigan, Dep't of Cmty. Health*, 587 F. App'x 850, 856 (6th Cir. 2014) (quoting *White*, 429 F.3d at 242 n.6). "[A]t the prima facie stage, the court compares the qualifications of the two applicants in very general terms, leaving the more rigorous analysis for the later stages of the *McDonnell Douglas* test." *Philbrick v. Holder*, 583 F. App'x 478, 484 (6th Cir. 2014).

Even under this less rigorous comparison of qualifications at the prima facie stage, the Court agrees with Defendants that Plaintiffs' evidence does not demonstrate that Crape was similarly situated either to Koch, the firefighter who received the promotion, or Metheny, the other Caucasian firefighter listed higher than Crape on the eligibility list. First and foremost, the applicants differ in relevant experience. Crape's prior experience as a trainer, while extensive, is dissimilar inasmuch as his experience was gained in the military context, as a military skills instructor from 1997 to 1999

and currently as an institutional instructor in the army reserves (Pls.' Resp., Dkt 63 at 6, 20).  Both Koch and Metheny, in contrast, have experience training firefighters.  Koch attended the Ohio Fire Academy and completed several courses in how to train firefighters (Defs.' Reply, Dkt 64 at 6).  Metheny was in charge of training at the Hickory Corners Fire Department (Dkt 60-55 at 18, J. Ex. 55, Applications).

Additionally, the seniority levels of the three applicants is dissimilar, and seniority is a relevant factor in analyzing the fourth element of a plaintiff's prima facie case.  *See, e.g., Williams v. Widnall*, 173 F.3d 431 (Table), 1999 WL 68574, at *9 (6th Cir. Jan. 21, 1999) (finding no error in the district court's conclusion that the employee who was not discharged was not similarly situated to the plaintiff because the retained employee was "the most senior" employee, and plaintiff, "the most junior"); *Thompson v. OhioHealth Corp.*, No. 2:07-cv-110, 2008 WL 5233468, at *8 (S.D. Ohio Dec. 11, 2008) (determining that the employee who was not discharged was not similarly situated to the plaintiff because the employee "had been employed by OhioHealth for approximately twenty one (21) years while plaintiff had been employed by OhioHealth for only approximately four months at the time of the termination of her employment"); *Zackery v. Auto Air Composites, Inc.*, No. 5:91-cv-35, 1993 WL 146687, at *4 (W.D. Mich. Feb. 17, 1993) (determining that the nonblack employee who was not discharged was not similarly situated to the plaintiff because the employee "had seniority and had completed his training and probationary period").  Koch and Metheny have been firefighters since 1993, whereas Crape has only been a firefighter since 2001 (Defs.' Reply, Dkt 64 at 5-6; (Dkt 60-55, J. Ex. 55, Applications).

Therefore, even absent the evidence of the applicants' different performances in the application process, a process that Plaintiffs contend is flawed and/or discriminatory, Defendants

14

have demonstrated that Crape is not similarly situated to the Caucasian applicants because of their differences in relevant experience and seniority, and Plaintiffs have not, in turn, demonstrated any genuine issue of material fact in support of a prima facie case. The Court need not proceed further in its analysis; however, in the interest of completeness, the Court turns to the second and third stages of the *McDonnell Douglas* analysis

b.   *Legitimate Non-Discriminatory Reason*

Defendants argue that even assuming Crape was similarly qualified to the two Caucasian applicants listed above him on the promotion eligibility list and that Plaintiffs could establish a prima facie case of disparate treatment race discrimination, Defendants have a legitimate non-discriminatory reason for failing to promote Crape, to wit: "the other applicants performed better during the application process, and they had more seniority" (Defs.' Br., Dkt 62 at 21-22). "[S]electing a more qualified candidate constitutes a legitimate non-discriminatory reason." *Hawkins v. Memphis Light Gas & Water*, 520 F. App'x 316, 319 (6th Cir. 2013); *see, e.g.,* *Provenzano*, 663 F.3d at 815. Defendants have therefore satisfied their burden of production. *See* *Upshaw*, 576 F.3d at 585-86 ("This is merely a burden of production, not of persuasion, and it does not involve a credibility assessment.") (citing *Reeves*, 530 U.S. at 142).

c.   *Pretext*

The burden thus shifts back to Plaintiffs to produce enough evidence to allow a reasonable jury to infer that Defendants' proffered reason is pretextual and that the adverse employment action was made because of Crape's race. "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or

15

(3) was insufficient to warrant the challenged conduct.'" *Wexler,* 317 F.3d at 576 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)); *see also Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013).  In other words, Plaintiff must "produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendants ... did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 579 (6th Cir. 2012) (quoting *Braithwaite v. The Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001)).

First, Plaintiffs emphasize Crape's qualifications, apparently in an effort to show that Defendants' proffered reason was insufficient to warrant the challenged conduct.  Plaintiffs opine that Crape was "extremely well-qualified for the position, possessing ample experience in precisely the range of skills the position required" (Pls.' Resp., Dkt 63 at 20).  Plaintiffs emphasize that Crape, a Licensed Practical Nurse, has extensive experience as a military skills instructor (*id*).  Specifically, from 1997 to 1999, Crape taught ropes rescue, confined space rescue, trench rescue, and the building of emergency shores for fire rescue (*id.*).  He provided training to the Washington, D.C. Fire Department, the FBI and the Secret Service, and he continues to serve in the army reserves as an institutional instructor (*id.* at 20, 6).

In *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006), the Supreme Court held that "qualifications evidence may suffice, at least in some circumstances, to show pretext." *Philbrick*, 583 F. App'x at 484-85.  "Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains 'other

probative evidence of discrimination.'" *Id.* at 485 (quoting *Provenzano*, 663 F.3d at 815); *see also Bartlett v. Gates*, 421 F. App'x 485, 490-91 (6th Cir. 2010) (citing *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627-28 (6th Cir. 2006)). A "more searching evaluation of the relative qualifications" of the candidates is conducted at this stage than was required at the fourth prong of the prima facie case. *Provenzano*, 663 F.3d at 816 (citing *Burdine*, 450 U.S. at 255).

In light of the Court's analysis and conclusion on the fourth element of Plaintiffs' prima facie case—that Crape is not similarly qualified to Koch and Metheny, it is implausible to conclude here, under the more searching evaluation permitted in this third and final stage of the *McDonnell Douglas* analysis, that Crape was "a plainly superior candidate" or "as qualified as if not better qualified than the successful applicant." And Crape's subjective view of his qualifications in relation to those of the other applicants cannot sustain a claim of discrimination. *See Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 664 n.13 (6th Cir. 2013) (quoting *Douglas v. Int'l Auto. Components Grp. N. Am., Inc.*, 483 F. App'x 178, 181 (6th Cir. 2012)); *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (citing *Johnson v. U. S. Dep't of Health & Human Servs.*, 30 F.3d 45, 47-48 (6th Cir. 1994)).

Second, Plaintiffs challenge several aspects of the application process, apparently to show that Defendants' proffered reason did not actually motivate the employment decision. Plaintiffs opine that the application process, while resulting in a final number that "lends the appearance of objectivity," was inherently subjective (Pls.' Resp., Dkt 63 at 10-14, 24-25). Plaintiffs emphasize that during the oral interview portion of the promotional testing, the interviewers were not looking for "correct" answers but were instead scoring "appearance," "social appropriateness," "creativity and originality" and other subjective factors. Plaintiffs also point out that "while there was a veneer

17

of anonymity achieved by commissioners referring to each applicant by the color of a piece of paper," the Commissioners could obviously observe the race of the applicants during their face-to-face interviews.  Last, Plaintiffs assert that the arrival by the three-interviewer panel at a consensus score was "yet another opportunity for subjectivity and discretion to enter into the process."  Specifically, Plaintiffs assert that "the Chief's well-known racist attitudes and desire not to hire minorities or females could have influenced the subjective scoring of the Commissioners who knew the Chief well, particularly in the case of Vogt, who was friends with the Chief and gave scores that vary widely from those of the other examiners" (*id.* at 22).[6]

The Sixth Circuit has acknowledged that "decisions made on the basis of subjective criteria, such as whether an employee is a team player or whether she would fit into a new corporate culture, can 'provide a ready mechanism for discrimination,' and thus should be 'carefully scrutinized.'" *Brewer*, 564 F. App'x at 843 (citing *Rowe v. Cleveland Pneumatic Co., Numerical Control*, 690 F.2d 88, 93 (6th Cir. 1982)); *see also Philbrick*, 583 F. App'x at 485; *Hedrick*, 355 F.3d at 461.  The Sixth Circuit has also cautioned courts against adopting the "illegitimate role of acting as ... 'super personnel department[s],'" when attempting to strike the balance between an employee's right against illegal discrimination against the employer's prerogative to make fundamental managerial decisions regarding whom to hire, fire, and promote.  *Bender*, 455 F.3d at 627; *Hedrick*, 355 F.3d at 462.  *See also Hicks v. SSP Am., Inc.*, 490 F. App'x 781, 784 (6th Cir. 2012) (observing that because of the nature of such a position, an employer has even greater flexibility in choosing a management-level employee than in choosing non-management-level employees); *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987) (same).

---

[6]Plaintiffs also point out a math error in Crape's final score, but they concede that the error did not impact Crape's placement on the eligibility list (Pls.' Resp., Dkt 63 at 14).

Here, the Court determines that Plaintiffs have identified no flaws in the promotion process that would permit a jury to reasonably infer racial prejudice, only Plaintiffs' speculation and conjecture about what "could have" happened during the subjective portion of the promotion process. As Defendants point out, "the record is devoid of any evidence to suggest that the Chief was involved in the 2010 Training Officer promotion decision," and there is "no evidence to connect the Chief's purported remarks in the 1990s to the Commission's promotion decision in 2010" (Reply, Dkt 64 at 8). And Plaintiffs' skepticism regarding the truth of Defendants' explanation for its promotion decision does not raise a triable issue as to pretext. "Courts have repeatedly held that the plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient for a race discrimination claim to withstand a motion for summary judgment." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992).

In sum, Plaintiffs' argument demonstrates Crape's dissatisfaction with the outcome of the application process, but Plaintiffs' evidence fails to create a triable issue on pretext.

d.    *Conclusion*

To survive a motion for summary judgment, a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, a defendant's proffered rationale. *Carter v. Toyota Tsusho Am., Inc.*, 529 F. App'x 601, 610 (6th Cir. 2013); *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). Plaintiffs did not produce enough evidence to support the fourth prong of their prima facie case. Even assuming, for the sake of argument, that Plaintiffs had produced enough evidence to support a prima facie case, Plaintiffs' evidence of pretext is insufficient to withstand summary judgment. Therefore, the Court grants Defendants summary judgment on Counts I and III.

19

2.      **Disparate Impact (Counts IV & V)**

In Counts IV and V, Plaintiffs present claims of disparate impact race discrimination under federal and state law.  "To establish a prima facie disparate-impact case, a plaintiff must: (1) identify a specific employment practice; and (2) present data indicating that the specific practice had an adverse impact on a protected group."  *Davis v. Cintas Corp.*, 717 F.3d 476, 494 (6th Cir. 2013).

Defendants argue that Plaintiffs' disparate impact claims suffer from two fundamental flaws: (1) neither the City nor the Commission established the employment practice in question here; and (2) Plaintiffs present no statistical evidence that the promotion process has had an adverse impact on African-American applicants (Defs.' Br., Dkt 62 at 27-28).

In response, Plaintiffs clarify that the employment practice they are challenging is Defendants' "practice of basing promotions on the results of the oral interview and file review" (Pls.' Resp., Dkt 63 at 26).  Plaintiffs argue that the City cannot shield itself from liability for discriminatory implementation of the laws simply by arguing that the electors of the City of Battle Creek "established" the promotion practice (*id.*).  Moreover, Plaintiffs emphasize that Defendants have complete discretion over the nature and content of the application process and bear full responsibility for any discriminatory impact that results from their administration (*id.*)

As for supporting statistical evidence, Plaintiffs assert that the racial disparities in this case are "so substantial that this showing is easily met" (Pls.' Resp., Dkt 63 at 27).  According to Plaintiffs, between 2004 and 2011, there were six promotional opportunities for which African-American candidates applied:  three training officer and three lieutenant tests (*id.*).  Plaintiffs assert that only one of the six African-Americans who applied, or 16 percent, "beat out a white applicant" and received a promotion (*id.*).

20

In reply, Defendants point out that the mere fact that a process resulted in a substantially higher percentage of unsuccessful African-American applicants is insufficient to demonstrate a Title VII disparate-impact violation (Reply, Dkt 64 at 10, citing *Johnson v. City of Memphis*, 770 F.3d 464, 477-78 (6th Cir. Oct. 27, 2014)).   Moreover, as detailed more fully by Defendants, Plaintiffs misstate the results of the 2011 lieutenant promotion process (*id.* at 10-11).   Defendants assert that, contrary to Plaintiffs' claims, only one African-American completed the application process in 2011 for the promotion to lieutenant, and that that individual was promoted; thus, there was a 100 percent minority promotion rate in 2011, not the 16 percent rate Plaintiffs claim (*id.* at 11, citing Defs.' Ex. D, Promotional Charts).   Last, Defendants point to African-American Douglas Brown's promotion to Captain in 2007 and African-American Quincy Jones's promotion to Fire Inspector in 2013 (*id.* at 11, n.10).

Even assuming arguendo that Plaintiffs are correct that Defendants established the employment practice in question, the Court agrees that Defendants have demonstrated they are entitled to judgment as a matter of law in the absence of any statistical evidence that the promotion process has had an adverse impact on African-American applicants.   The evidence presented on this record does not reveal a sufficient disagreement to require submission to a jury.   Rather, the evidence presented on this record is so one-sided that Defendants must also prevail as a matter of law on Plaintiffs' disparate impact race discrimination claims in Counts IV and V.

3.      **Equal Protection 42 U.S.C. § 1983 (Count VII)**

To succeed on a claim brought under 42 U.S.C. § 1983, a plaintiff must prove: (1) that he was deprived of a right secured by the Constitution or federal laws; and (2) that the deprivation was committed by a person acting under color of state law.  *Toth v. City of Toledo*, 480 F. App'x 827, 831-32 (6th Cir. 2012) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) (overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986)).

In Count VII, Plaintiffs allege that Defendants violated the Equal Protection Clause when they failed to promote Crape to the Training Officer position.  The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike."  *Foster v. Michigan*, 573 F. App'x 377, 396 (6th Cir. 2014) (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  "The showing a plaintiff must make to recover on a disparate treatment claim[] under Title VII mirrors that which must be made to recover on an equal protection claim under § 1983."  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004) (citation omitted).

Defendants reiterate their arguments that (1) Plaintiffs have no claim against the City because the City took no adverse employment action against Crape; (2) Plaintiffs cannot prove that Crape was passed over for a non-African-American employee who had similar qualifications; and (3) Plaintiffs have no evidence that the Commission's decision to promote another firefighter was a pretext for unlawful race discrimination against Crape (Defs.' Br., Dkt 62 at 29-30).[7]

Plaintiffs did not separately respond to Defendants' arguments challenging Count VII, instead merely indicating that their disparate treatment race discrimination claims are brought under

---

[7]In their motion brief, Defendants incorrectly reference Plaintiffs' equal protection claim as Count VI (Defs.' Br., Dkt 62 at 29).

Title VII, ELCRA, and the Equal Protection Clause (Pls.' Resp., Dkt 63 at 14) and noting that "[t]he analysis accordingly applies to all of Mr. Crape's claims of disparate treatment" (*id.* at n.6). Consequently, for the reasons previously discussed, Plaintiffs' § 1983 claim in Count VII similarly fails to survive Defendants' summary judgment motion.

### III.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Dkt 61) is properly granted.  An Order and corresponding Judgment will be entered consistent with this Opinion.


DATED: May 11, 2015                          /s/ Janet T. Neff
                                             JANET T. NEFF
                                             United States District Judge

23